Passaic National Bank and Trust Company, trustee, complainant-respondent,

*v.*

John B. Owens et al., defendants-appellants.

[Submitted May term, 1932. Decided October 17th, 1932.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Bigelow, who filed the following opinion:

"This is a suit to foreclose a mortgage made by John B. Owens to Passaic National Bank and Trust Company, as

trustee, to secure two hundred and forty coupon bonds aggregating $120,000 made by Owens payable to bearer and maturing between 1924 and 1933. The bonds were executed at about the date of the mortgage, April 15th, 1922; were certified by the trustee and forthwith handed back to Owens. Nearly seven years later, namely, on February 16th, 1929, the Empire Floor and Wall Tile Company (a company controlled by Owens and the lessee of the mortgaged premises) borrowed $39,000 from the Passaic National Bank and Trust Company on its demand note. At the same time, Owens pledged to the bank as security for the note, all of the two hundred and forty bonds above mentioned. The terms of the pledge were embodied in a printed agreement signed by Owens empowering the bank, upon default in payment of the note, to sell the bonds at public or private sale, and further, if the bonds were sold at public auction, authorizing the bank itself to purchase at the sale free from any equity of redemption of the pledgor.

"On August 28th, 1930, a writ of attachment issued out of the New Jersey supreme court against Owens at the suit of the Old Citizens National Bank of Ohio. By virtue thereof, the sheriff attached the mortgaged premises. In the attachment suit, the Ohio bank has recovered judgment for $35,793.12.

"On September 10th, 1930—two weeks after the attachment issued—Owens executed an agreement assigning to the Metuchen National Bank all his right, title and interest in the bonds held by the Passaic bank in order to secure a certain note of the tile company, discounted by the Metuchen bank, or any renewal thereof, and any other indebtedness of the tile company to the Metuchen bank then existing or thereafter incurred. This instrument was recorded as a chattel mortgage in the Passaic county register's office, September 27th, 1930. The Metuchen bank now holds four overdue notes of the tile company dated in 1931, aggregating $18,525.22. One of these notes, for $13,500, is a renewal of the note expressly mentioned in the agreement.

"The bill of complaint in the present cause was filed April

20th, 1931. The following day, though before process issued, the Passaic bank went through the form of selling the bonds at auction to itself. The sale was conducted in an office of the trust department of the bank. Two or three officers of the bank were present, as were a very few other people. The Passaic bank does not, however, rely on this sale; it does not seek a decree for $120,000 as it would if it were the owner of the bonds in the ordinary course. It asks a decree for $29,222.23, being the amount remaining unpaid on its note with interest and expenses incurred for the preservation of the mortgaged premises, such as watchman's hire. Neither the priority nor the amount claimed by the Passaic bank is disputed. The controversy is between the Metuchen and Ohio banks.

"Two objections to the claim of the Metuchen bank may be readily disposed of; first, that its mortgage was not promptly recorded as required by section 4 of 'An act concerning mortgages on chattels' (Revision of 1902). *Comp. Stat. p. 463.* The statute cited does not apply to the instrument executed by Owens in favor of the Metuchen bank. The bonds thereby assigned are not goods or chattels within the meaning of the act. Failure to record this instrument promptly does not affect the claim of the bank, since the bank was not required to record it at all as a chattel mortgage. *Williamson* v. *New Jersey Southern Railroad Co., 26 N. J. Eq. 398, 403; Bleakley* v. *Nelson, 56 N. J. Eq. 674.*

"Next, it is objected that the interest of the Metuchen bank in the bonds was cut off by the sale of the bonds under the terms of the pledge held by the Passaic bank. As a general rule, a pledgee cannot buy in at its own sale and if it attemps to do so, the sale is voidable. *49 C. J. 1006.* The contract between Owens and the Passaic bank authorized the latter to purchase if the sale were at public auction. The Ohio bank says the sale was at public auction, but to this I cannot agree. An auction is not public unless the public is given a reasonable opportunity to attend and to bid. No such opportunity was given in the present instance. The sale was not advertised; it was not held in a public place but in a private

office; the attendance was limited to a few interested parties; no others were invited; it was not a public auction. The Passaic bank has never asserted an absolute title to the bonds; it has continued to hold as pledgee. The Metuchen bank was not cut off by the sale.

"I now come to the principal subject of investigation—the nature of the transaction between Owens and the Metuchen bank and its effect on the attachment of the Ohio bank. But first it is necessary to examine the situation at an earlier stage. Just before the bonds were pledged with the Passaic bank, while they were still all held by Owens, nothing was due on the mortgage. The bonds in his hands were not evidence of indebtedness, nor were they property. They were of no significance at all. Owens could rightfully and effectively have demanded of the trustee cancellation of the mortgage if he had seen fit. Upon delivery of the bonds to the Passaic bank, the mortgage became effective as security for $39,000 or such other sum as might be chargeable under the agreement of pledge between Owens and the bank. The nominal amount of the bonds and mortgage, $120,000, was unimportant between the parties to the transaction except as limiting the sum for which the bank could look to the mortgaged property as security. As to third parties, acquiring an interest in the property subsequent to the recording of the mortgage, the record was notice that the amount due thereon might be as great as $120,000.

"When the Ohio bank issued its attachment, the lien of that writ immediately fastened on the property, second only to complainant's mortgage, not for $120,000 but for about $30,000, the sum then due complainant. So matters stood two weeks later, when the Metuchen bank acquired the interest on which it claims. There is some similarity between the situation so created and the one frequently arising from a mortgage to secure future advances. An advance-money mortgage is prior to subsequent liens to the extent of all advances made before actual notice of the subsequent liens. *Miceli* v. *Falduti, 101 N. J. Eq. 103*. The Metuchen bank had no actual notice of the attachment when it accepted from

Owens the pledge of his equity in the bonds and in reliance thereon discounted the notes of the tile company which it now holds. It is said by the Ohio bank that the Metuchen bank made no actual "advances" on the bonds and that it holds the bonds only as security for a pre-existing debt. It did, however, in consideration of the pledge, renew the tile company's note for $13,500, which it already held, and later it loaned additional sums to the tile company. If the present case is governed by the rule applied to advance-money mortgages, then the Metuchen bank has priority over the Ohio bank.

"But in ordinary cases, advances on the mortgage are made by the mortgagee, and the mortgagee is the party to whom the subsequent encumbrancer must give notice if he would prevent further advances taking priority over his lien. Here the advances were made by a stranger to the mortgage. The Ohio bank had no means of knowing that the Metuchen bank would become interested in the premises and no reason to notify that bank of its attachment. This distinction is not, however, fatal to the case of the Metuchen bank. In *Central Trust Co.* v. *Continental Iron Works, 51 N. J. Eq. 605,* Mr. Justice Van Syckel, for the court of errors and appeals, said of a corporate mortgage securing a bond issue: 'It was made for the express purpose of securing money to be advanced and differs only in the fact that the future bondholders being unknown, the agreement to advance could not be made with them in person. It was in substance and effect made with the trustees named in the mortgage for the benefit of such bondholders and equity should so regard it.' The court held that mechanics' liens which accrued after the mortgage was recorded but before any bonds were issued or sold, were subordinate to the rights of the bondholders under the mortgage.

"The Metuchen bank seeks to strengthen its position on the theory that it is a *bona fide* holder for value of negotiable bonds without notice of any infirmity. The holder of bonds as collateral for an existing debt is a *bona fide* holder for value to the same extent as though he were a purchaser for cash. *Hoskins* v. *Seaside Ice Manufacturing Co., 68 N. J. Eq. 476.* But the Metuchen bank has never been a holder of

the bonds; it is merely the assignee of a secondary interest therein. Furthermore, when this interest was acquired, many of the bonds, having matured before 1930, were overdue. All the bonds, as I recall, still carry all interest coupons indicating defaults in the payment of interest. But even had there been an actual delivery of the bonds to the Metuchen bank before they matured, the bank would not be aided thereby. Since it derived title directly from Owens, who was himself the maker of the bonds, the bank is no better off than if the bonds were non-negotiable. If the bonds had been delivered to the bank by the tile company, the situation might be different, and the bank hold free from equities existing between prior parties. Again, this is not an action on the bonds, but a suit on the mortgage; the questions litigated are not raised by the maker or prior holders of the bonds, but by a stranger, the Ohio bank. The Metuchen bank can have no benefit from the negotiable character which commonly attaches to corporate bonds.

"The difficulty with this whole matter arises from the fact that the Passaic bank, the Metuchen bank and Owens were dealing in fictions. Each bond contained Owens' promise to pay to bearer $500 at a certain date and to pay interest thereon semi-annually upon presentation of the coupon. The mortgage contained elaborate provisions for foreclosure by the trustee at the request of the bondholders upon default in the payment of interest or principal of any bond. These provisions did not express at all the real agreements between the parties. The banks were not interested in the maturity or interest date fixed by the bonds and mortgage or the amounts which Owens thereby promised to pay. They knew that those dates and amounts had not been observed in the past and had no reason to expect they would be in the future.

"The Ohio bank argues forcibly that at the time of its attachment, the only people interested in the mortgage were Owens as mortgagor and the Passaic bank as mortgagee; that the situation is the same as if Owens had given to the Passaic bank an ordinary bond and mortgage. Owens, when he made his agreement with the Metuchen bank, had no interest in the

mortgage which he could assign, any more than an ordinary mortgagor can assign an interest in his mortgage. An agreement between the mortgagor and a third party to extend to the latter the benefit and lien of the mortgage, is either a nullity or else the agreement, despite its form, is a new mortgage on the land. As such, it is subordinate to all liens on the property acquired before it is made. Such is the view of the matter presented by the Ohio bank; it appeals strongly to me, but I think it is not the true view. All parties dealing with Owens since the record of the mortgage in 1922, did so at their peril with respect to any rights which might accrue in favor of anyone under that mortgage. Owens could sell bonds pursuant to the terms of the mortgage to whom he pleased or could deposit the bonds as collateral security. If he had given some of the bonds to the Passaic bank and others to the Metuchen bank, the situation would be clearer, but I see no reason why a third party can complain of his doing exactly what he did.

"I will advise a decree establishing the claim of the Passaic bank as a first lien, of the Metuchen bank as second, and of the Ohio bank as a third lien."

*Messrs. Corbin & Harty,* for the complainant-respondent.

*Mr. Edward R. McGlynn* and *Mr. George W. Litterst,* for the defendants-appellants Metuchen National Bank.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Bigelow.

*For affirmance*—THE CHANCELLOR, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, BROGAN, VAN BUSKIRK, KAYS, DEAR, WELLS, KERNEY, JJ. 13.

*For reversal*—None.